INTERSTATE COMMERCE COMMISSION v. CINCINNATI, N. O. & T. P. RY. CO. et al.[1]

(Circuit Court, N. D. Georgia. June 3, 1893.)

1. FEDERAL COURTS—PRACTICE—PROCEEDING TO ENFORCE ORDER OF INTER-STATE COMMERCE COMMISSION—EVIDENCE.

A suit brought by the interstate commerce commission in the United States circuit court to enforce an order of the commission is an original and independent proceeding. The court is not confined to a mere re-

[1]Reported by Ed. Baxter, Esq., of the Nashville bar.

examination of the case as heard and reported by the commission, but the court hears and determines the cause de novo upon proper pleadings and proof. The commission's report is prima facie evidence of the matters of fact therein reported, but the court will hear all such other and further testimony as either party may introduce bearing upon the matters in controversy, and will permit such pleadings as will bring before the court clearly and in legal form such matters as may be pertinent and proper in view of the issues raised. Cases cited: Kentucky & I. Bridge Co. v. Louisville & N. R. Co., 37 Fed. Rep. 567; Interstate Commerce Commission v. Lehigh Val. R. Co., 49 Fed. Rep. 177; Interstate Commerce Commission v. Atchison, T. & S. F. R. Co., 50 Fed. Rep. 295.

**2. CARRIERS—INTERSTATE COMMERCE ACT—CONTINUOUS CARRIAGE.**

The first section of the act to regulate commerce (Feb. 4, 1887, 24 Stat. 379) provides that it "shall apply to any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water where both are used under a common control, management, or arrangement, for a continuous carriage or shipment," etc. The Georgia Railroad extends from Atlanta to Augusta. The Georgia Railroad Company requested its connections that in issuing bills of lading to its local stations no rates be inserted east of Atlanta. There is no agreement on the part of said company for any such joint tariff, as implies a reduced rate from Cincinnati, Ohio, to its local stations. On the contrary, that company collects and retains its entire local rates on all freight shipped from Cincinnati to its local stations. *Held*, that there is no such "arrangement for a continuous carriage or shipment" existing between said company and its connections as to bring the rates which are charged to said local stations within the first section of the act to regulate commerce. Case cited: Railway Co. v. Osborne, 52 Fed. Rep. 912, 3 C. C. A. 347.

**3. SAME—THROUGH RATES—CONNECTING LINES.**

When goods are shipped through from Cincinnati, Ohio, to local stations on the Georgia Railroad, the initial carrier at Cincinnati issues through bills of lading, and quotes through rates. Said rates, however, are arrived at by adding to the rates from Cincinnati to Atlanta the full local rates of the Georgia Railroad from Atlanta to said local stations. The Georgia Railroad Company receives the goods at Atlanta, and transports them continuously to its local stations, but it demands and collects its full local rates from Atlanta to said local stations. *Held*, that the mere reception, and continuous transportation, by the Georgia Railroad Company, of freight which comes to it over other lines of railroads, destined to its local stations, for which the initial carrier has issued through bills of lading and quoted through rates, does not constitute such an "arrangement" as is contemplated by the first section of the act to regulate commerce, where the through rates so quoted allow to that company its full local rates.

**4. SAME—SHORT-HAUL CLAUSE—"LINE."**

The fourth section of the act to regulate commerce (Feb. 4, 1887, 24 Stat. 380) provides that it "shall be unlawful for any common carrier, subject to the provisions of this act, to charge or receive any greater compensation, in the aggregate, for the transportation of passengers, or of like kind of property, under substantially similar circumstances and conditions, for a shorter than for a longer distance, over the same line, in the same direction, the shorter being included within the longer distance " There is a clear distinction between the term "railroad," as used in the other parts of the act, and the term "line," as used in the fourth section. The use of the word "line" is significant. Two carriers may use the same "road," but each has its separate "line." One railroad company may lease trackage rights to another, but the joint use of the same track does not create the same "line" so as to compel either company to graduate its tariff by that of the other. Case cited: Railway Co. v. Osborne, 52 Fed. Rep. 912, 3 C. C. A. 347.

**5. SAME—CONNECTING ROADS.**

There must be a "common arrangement" between connecting companies —such as the making of a joint tariff—before a "new line" can be formed: and the "line" so formed under the joint tariff of connecting companies is one which is separate and independent from that of either of the connecting companies. Case cited: Railway Co. v. Osborne, 52 Fed. Rep. 912, 3 C. C. A. 347.

**6. SAME—CONNECTING ROADS CANNOT BE COMPELLED TO MAKE THROUGH-RATE ARRANGEMENT.**

"No power exists at common law, and none is given by the act to regulate commerce, to compel connecting railroad companies to unite in a joint tariff, or to enter into a through-rate arrangement for transportation, unless they desire to do so. They cannot be compelled to abandon the full control of their separate roads, and neither of them is bound to adjust its own local tariff to suit the other." Case quoted: Railway Co. v. Osborne, 52 Fed. Rep. 912, 3 C. C. A. 347. See, also, Kentucky & I. Bridge Co. v. Louisville & N. R. Co., 37 Fed. Rep. 630; Little Rock & M. R. Co. v. St. Louis, I. M. & S. R. Co., 41 Fed. Rep. 563.

**7. SAME—GEORGIA RAILROAD COMPANY.**

There is no "common arrangement" or "joint tariff" between the Georgia Railroad Company and its connections as to traffic to its local stations. On the contrary, there is an express refusal by that company to make any "common arrangement" whatever in regard to that traffic. The Georgia Railroad Company demands and collects its full local rates on all shipments to its local stations. Whether shipments come from points west of Atlanta, or originate at Atlanta, the rate is precisely the same, and as to the Georgia Railroad the carriage is the same.

**8. SAME—ARRANGEMENT AS TO THROUGH RATES DOES NOT AFFECT LOCAL RATES.**

The Cincinnati, New Orleans & Texas Pacific Railway Company, the Western & Atlantic Railroad Company, and the Georgia Railroad Company have formed "a new and independent line," by the adoption of a joint through tariff from Cincinnati to Augusta; but such "new line" is distinct and separate from that of either of the railroads named. Case cited: Railway Co. v. Osborne, 52 Fed. Rep. 912, 3 C. C. A. 347.

**9. SAME—COMBINATION LOCAL AND THROUGH RATE.**

Social Circle is a local station on the Georgia Railroad, 52 miles east of Atlanta, and 119 miles west of Augusta. The Georgia Railroad Company refuses to adopt a joint through tariff from Cincinnati to Social Circle, and charges its full local rate from Atlanta to Social Circle. The rate from Cincinnati to Social Circle is a combination rate, and it is arrived at by adding to the rate from Cincinnati to Atlanta the full local rate of the Georgia Railroad from Atlanta to Social Circle. The rate thus made from Cincinnati to Social Circle is greater than the joint through tariff rate from Cincinnati to Augusta; but that fact constitutes no violation of the "long and short haul" clause of the act to regulate commerce, because the two rates are not made "over the same line." The rate to Augusta is made by the "line" formed by a "common arrangement" between said three companies for a joint tariff between these points. The rate to Social Circle is made greater than the rate to Augusta by the Georgia Railroad Company demanding its full local rate on its own road, which road is separate and independent from the "line" made by said three companies. Cases cited: Railway Co. v. Osborne, 52 Fed. Rep. 912, 3 C. C. A. 347; U. S. v. Mellen, 53 Fed. Rep. 229.

**10. SAME—SUBSTANTIALLY SIMILAR CIRCUMSTANCES—COMPETITION.**

"Freight carried to or from a competitive point is always carried under substantially dissimilar circumstances and conditions from that carried to or from noncompetitive points. In the latter case, the railway makes its own rates, and there is no good reason why it should be allowed to charge less for a long haul than a short one. When each haul is made to or from a noncompetitive point, the effect of such discrimination is to build up one place at the expense of the other. Such action is willfully

unjust, and has no justification or excuse in the exigencies or conditions of the business of the corporation. In the former case, the circumstances are altogether different. The power of a corporation to make a rate is limited by the necessities of the situation. Competition controls the charge. It must take what it can get, or abandon the field, and let its road go to rust." "Competition may not be the only circumstance that makes the condition under which a long and short haul are performed substantially dissimilar, but certainly it is the most obvious and effective one, and must have been in contemplation of congress in the passage of the act to regulate commerce." Case quoted: Ex parte Koehler, 31 Fed. Rep. 315, 319.

11. SAME.

"That competition, the life of trade, cuts an important figure in the condition and circumstances attendant upon transportation of passengers and property, cannot be well overlooked nor denied. Nor can it be well denied that, as between the short and long haul, competition may exist to that extent that what would otherwise be similar circumstances and conditions will be dissimilar circumstances and conditions." Case quoted: Missouri Pac. Ry. Co. v. Texas & P. Ry. Co., 31 Fed. Rep. 862.

12. SAME.

"A common carrier cannot be required to ignore or overcome existing differences in the transportation facilities of different localities, created not by its own arbitrary action, but by nature, or by enterprise beyond its control. * * * Wherever and whenever actual competition exists, the question the carrier has to deal with is not so much what is a fair rate for the service, or what the traffic will bear, but what rate can be got for the service, as against the rate offered by the competitor." Case quoted: Interstate Commerce Commission v. Atchison, T. & S. F. R. Co., 50 Fed. Rep. 306.

13. SAME—DISSIMILAR CIRCUMSTANCES—CARRIER NEED NOT APPLY TO COMMISSIONER FOR RELIEF.

"It is not necessary for a carrier to apply to the interstate commerce commission for relief from "the long and short haul" clause of the act to regulate commerce, when the circumstances and conditions are substantially dissimilar, since the carrier, in acting upon them, would commit no breach of the law, though it would be responsible in case it were found that the circumstances and conditions were misconceived or misjudged." Case quoted: In re Louisville & N. R. Co., 1 Inter St. Commerce Com. R. 53.

14. SAME—COMPETITION WITH FOREIGN AND DOMESTIC CARRIERS.

The interstate commerce commission holds that where railroads which are subject to the act to regulate commerce compete with Canadian or other railroads, which are not subject to the act, such competition constitutes dissimilar circumstances and conditions; but that competition between two railroads, both of which are subject to the act, does not constitute dissimilar circumstances and conditions. The commission, however, also holds that it has no authority to raise railroad rates. If a railroad, which is subject to the act, is met with competition from other railroads, which are also subject to the act, and the commission has no authority to require such other railroads to increase their rates, even when the competition is ruinous, there is no practical difference between such a case and the case of competition with railroads not subject to the act. If the general conclusion is correct that competition will constitute dissimilar circumstances and conditions, in the sense in which that term is used in the act, there is no good reason for drawing the line where it has been drawn by the commission. On the contrary, competition of carrier with carrier, both subject to the act, is as much within the terms of section 4 as competition with a carrier not subject to the act.

15. SAME—COMPETITION BETWEEN MARKETS.

Competition of market with market may not be so direct in its effect as competition of carrier with carrier; but when it does exist it is influential, and perhaps as effective and controlling, with carriers, as to their rates,

as other competition. It may therefore constitute a part of the circumstances and conditions which a carrier can consider in fixing rates for the transportation of goods.

**16. SAME.**

The fact that the rate from Cincinnati to Social Circle is greater than the joint tariff rate from Cincinnati to Augusta, constitutes no "undue or unreasonable prejudice or disadvantage" against Social Circle, and no "undue or unreasonable preference or advantage" in favor of Augusta. Railway companies are only bound to give the same terms, to all persons alike, under the same conditions and circumstances; and any fact which produces an inequality of condition, and a change of circumstances, justifies an inequality of charge. Augusta and Social Circle are not "under the same conditions and circumstances." Case cited: Interstate Commerce Commission v. Baltimore & O. R. Co., 12 Sup. Ct. Rep. 844, 145 U. S. 263.

**17. SAME—RATES FROM CINCINNATI TO AUGUSTA.**

Several lines of railway compete for the business between Cincinnati and Augusta, and there is active and influential competition by Baltimore and other eastern cities against Cincinnati for the trade of Augusta.

**18. SAME—RATES—SOUTHERN RAILWAY & STEAMSHIP ASSOCIATION.**

Nearly all of the railroads south of the Ohio river and east of the Mississippi, including the three railroad defendants in this case, are members of an association known as the Southern Railway & Steamship Association. Said association, in making rates, is governed by competition. The same influences control in the association, in making rates, as would control without it; and, while the influences may not go to the same extent, and there may be produced by the association more harmonious relations between its members, competition influences, and, to a large extent, controls, the rates agreed upon by the association.

**19. SAME—UNREASONABLE RATE—EVIDENCE.**

It appears that the rate charged on first-class goods in less than car-load lots from Cincinnati to Atlanta, in 1879, was $1.39 per 100 lbs.; that afterwards it was $1.10; and subsequently $1.07; except for a short time, when it was $1.01. The only testimony offered to or heard by the commission as to the reasonableness of the rate was that of the vice president of the Cincinnati, New Orleans & Texas Pacific Railway Company, that he considered a rate of $1.01 reasonable. Upon that testimony, and upon the fact that the rate from Cincinnati to Birmingham is 89 cents, as compared with $1.07 to Atlanta, the distances being substantially the same, the commission ordered that the defendants should not charge more than $1 from Cincinnati to Atlanta. In this court, a number of railroad experts testified that the present rate of $1.07 is reasonable. As to the rate to Birmingham, there was evidence before this court which was not before the commission, viz. that the rate from Cincinnati to Birmingham, which was previously $1.08, was forced down to 89 cents by the building of a new road known as the Kansas City, Memphis & Birmingham Railroad. *Held*, that the existence of a lower rate from Cincinnati to Birmingham furnished no sufficient reason to determine that the rate from Cincinnati to Atlanta is unreasonable when such lower rate is caused by conditions at Birmingham which do not exist at Atlanta. *Held*, further, that the evidence offered in this court is sufficient to overcome the prima facie case made by the findings of the commission. On the whole testimony, as now before this court, it is not believed that the commission would have found the rate in question to be unreasonable. Certainly this court cannot so determine.

S. A. Darnell, A. G. Safford, and R. L. Berner, for petitioner, the interstate commerce commission.

Edward Colston, for respondent Cincinnati, N. O. & T. P. Ry. Co. Payne & Tye, for respondent Western & A. R. Co.

J. B. Cumming, Edward Baxter, and George Hillyer, for respond-
ent Georgia R. Co.

NEWMAN, District Judge. This is an application by the inter-
state commerce commission to this court to enforce an order passed
by the commission in the case of the James & Mayer Buggy Com-
pany v. The Cincinnati, New Orleans & Texas Pacific Railway Com-
pany, the Western & Atlantic Railroad Company, and the Georgia
Railroad Company.

The petition of the James & Mayer Buggy Company to the inter-
state commerce commission was as follows:

"The petition of the above-named complainant respectfully shows: (1)
That the James & Mayer Buggy Company manufacture buggies, carriages,
etc., in the city of Cincinnati, state of Ohio. (2) That the defendants above
named are common carriers, and, under a common control, management, or
arrangement for continuous carriage or shipment, are engaged in the trans-
portation of passengers and property, wholly by railroad, between Cincinnati,
in the state of Ohio, and Chattanooga, in the state of Tennessee; and be-
tween Chattanooga, in the state of Tennessee, and Atlanta, in the state of
Georgia; and between Atlanta, in the state of Georgia, and Augusta, in the
state of Georgia; and, as such common carriers, are subject to the act to
regulate commerce. (3) That the first-class rate of freight, as published in
the tariff of the C., N. O. & T. P. R. R. Co., from Cincinnati, Ohio, to Atlanta,
Georgia, the distance being about 477 miles, (more or less,) is $1.01 per hun-
dred lbs. (4) That the first-class rate of freight from Cincinnati, Ohio, to
Augusta, Georgia, over the same lines of railroad, the distance being about
648 miles, (more or less,) is also $1.01 per hundred lbs. (5) That the first-
class rate of freight from Cincinnati, Ohio, to Social Circle, Georgia, over the
same lines, the distance being about 525 miles, (more or less,) is $1.31 per
hundred lbs. (6) That the complainant above named, shipping vehicles to
Atlanta, Georgia, ought not to be compelled to pay the same rate of freight
as when shipping to Augusta, Georgia, a point 171 miles further distant on
the same lines. (7) That the complainant above named, in shipping vehicles
to Social Circle, Georgia, ought not to be compelled to pay a rate of freight
which is 30 cents per hundred lbs. higher than when shipping to Augusta,
Georgia, a point 120 miles (more or less) further distant along the same
lines. (8) That the above-named defendants are violating section 4 of the
act to regulate commerce, in charging a greater sum for a shorter distance
than for a longer distance, in the same direction, over the same lines."

The above petition prayed that an order be made commanding
the defendant to cease and desist from the violation complained of,
and was signed and sworn to by a representative of the James &
Mayer Buggy Company.

The answer of the Western & Atlantic Railroad Company was as
follows:

"The Interstate Commerce Commission, Washington, D. C.—Gentlemen:
I have before me your favor of October 22d, inclosing a copy of petition filed
against our company, embracing a statement of charges made by the James
& Mayer Buggy Company. In reply I will state that there is nothing in the
interstate commerce law, so far as we read it, which requires that we should
make from Cincinnati to Atlanta a less rate than from Cincinnati to Augusta.
Therefore we do not consider that that portion of the complaint filed by the
petitioners has any force. Regarding the rate of freight from Cincinnati to
Social Circle, Georgia, I will state that Social Circle is a local point on the
Georgia Railroad, and that company has not furnished us with any basis for
working business to its local points, other than taking the rate, as in this
instance, from Cincinnati to Atlanta, and adding their local. This company,
on this business, has charged no more than if the freight had stopped at

Atlanta, or than it would receive going to any point within the same radius from Atlanta as that in which Social Circle is located. Further, as the rates to Augusta are brought down by water competition, we do not consider that we have violated the interstate commerce law. The rate within itself is not unreasonable, and we cannot see that there is any discrimination against the parties at Social Circle; and this company, furthermore, is unable to control the local rates of any of its connections."

## The answer of the Georgia Railroad Company was as follows:

"This respondent, answering, says: (1) It is informed and believes that the James & Mayer Buggy Company manufacture buggies, carriages, etc., in the city of Cincinnati, state of Ohio. (2) This defendant, and the defendants above named, are common carriers, and, under a common arrangement for continuous carriage or shipment, are engaged in the transportation of passengers and property, wholly by rail, between Cincinnati, in the state of Ohio, and Chattanooga, in the state of Tennessee; and between Chattanooga, in the state of Tennessee, and Atlanta, in the state of Georgia, and Augusta, in the state of Georgia. (3) The rate of freight on buggies, carriages, etc., from Cincinnati, Ohio, to Atlanta, Georgia, the distance being about 473 miles, was, at the date named, one dollar and one cent per hundred pounds in less than car-load lots, knocked down, boxed, or crated, and released. This was an unauthorized rate. The proper rate, Cincinnati to Atlanta, should have been one dollar and seven cents per hundred pounds. (4) The rate of freight on buggies, carriages, etc., from Cincinnati, Ohio, to Augusta, Georgia, over the same lines of railroad and the railroad of this respondent, the distance being about 645 miles, is also one dollar and seven cents per hundred pounds. (5) This respondent says that it has no arrangement with the roads between Atlanta, the western terminus of respondent's railroad, and Cincinnati, for through rates from Cincinnati to any station on the Georgia Railroad, other than Milledgeville,—where respondent competes with the Central Railroad of Georgia,—and the terminal stations of Augusta, Athens, and Washington. That if a through bill of lading is issued at Cincinnati for freight from that point to Social Circle, a station on respondent's railroad, the rate is made as follows, to wit, by adding to the rate from Cincinnati to Atlanta respondent's local rate from Atlanta to Social Circle. Thus the rate from Cincinnati to Atlanta, as given above, is $1.07 per hundred pounds, to which is added respondent's local rate from Atlanta to Social Circle, to wit, 30 cents per hundred pounds, making a through rate from Cincinnati to Social Circle of $1.37 per hundred pounds. Respondent does not quote any through rate from Cincinnati to any stations on its railroad except Milledgeville and the terminal stations above named; but of course its local tariff, as fixed by the Georgia Railroad Commission, is known to the initial road at Cincinnati. (6) Respondent says that the rate from Atlanta to Social Circle is just and reasonable; also that the rate from Cincinnati to Social Circle is just and reasonable, and not obnoxious to any provision of the interstate commerce act by reason of not being just and reasonable. (7) Respondent further says that the through rate from Cincinnati to Augusta, though the same as from Cincinnati to Atlanta, is not unlawful under section 4 of the interstate commerce act, because said rates are charged not under substantially similar circumstances and conditions. In explanation of this statement, respondent says that at Baltimore, Maryland, and other eastern cities, large manufactories of buggies, carriages, etc., exist, and that the product of these factories is transported from said places to Augusta at such rates that, if this respondent and its connections between Atlanta and Cincinnati charge a higher rate than one dollar and seven cents per hundred pounds from Cincinnati to Augusta, no freight of this character would come over the Georgia Railroad; for the product of the eastern factories would be delivered in Augusta at a rate which would exclude the Cincinnati product from the Augusta market. (8) This respondent says that, while no arrangement exists, as above stated, for a through bill of lading from Cincinnati to Social Circle, as a matter of fact the shipment from Cincinnati to Social Circle by the petitioner was made on a through bill of lading, the rate of which was fixed, as hereinbefore

stated, by adding this respondent's local rate from Atlanta to Social Circle to the through rate from Cincinnati to Atlanta."

The answer of the Cincinnati, New Orleans & Texas Pacific Railway Company in the case before the commission was as follows:

"The Cincinnati, New Orleans & Texas Pacific Railway Company, for answer to the petition of complainant herein, says: (1) It admits that the James & Mayer Buggy Company manufactures buggies, carriages, etc., in the city of Cincinnati, state of Ohio. (2) That the above-named defendants are common carriers engaged in the transportation of passengers and property wholly by railroad between Cincinnati, Ohio, and Atlanta, Georgia, and between Cincinnati, Ohio, and Augusta, Georgia; but it says that said defendants are not under a common control, management, or arrangement for continuous carriage or shipment, but that, on the contrary, the connection of this defendant with such carriage or shipment begins at Cincinnati, Ohio, and ends at Chattanooga, Tennessee; that of the Western & Atlantic Railroad Company begins at Chattanooga, Tennessee, and ends at Atlanta, Georgia; and that of the Georgia Railroad begins at Atlanta, and ends at Augusta, in the state of Georgia. (3) It admits that the first-class rate of freight published in the tariff of this defendant from Cincinnati, Ohio, to Atlanta, Georgia, a distance of about 477 miles, is $1.01 per 100 pounds. (4) It admits that the first-class rate of freight from Cincinnati, Ohio, to Augusta, Georgia, a distance of about 648 miles, is also $1.01 per 100 pounds. (5) It admits that the first-class rate of freight from Cincinnati, Ohio, to Social Circle, Georgia, over the same line, the distance being about 525 miles, (more or less,) is $1.31 per 100 pounds. It says that the power of this defendant over said rates of freight, and the division thereof, only extends to securing a reasonable compensation for the services performed in transporting merchandise from Cincinnati, Ohio, the northern, to Chattanooga, Tennessee, the southern, terminus of its line; that its proportion of the rate of $1.01 to Atlanta, Georgia, is 71.6 cents, and that the Western & Atlantic Railroad Company is 29.4 cents per 100 pounds; that its proportion of the rate to Augusta, Georgia, from Cincinnati, Ohio, is 52.6 cents; that of the Western & Atlantic 21.6 cents, and that of the Georgia Railroad is 26.8 cents; that said rate to Atlanta is reasonable and just, and a reasonable compensation for the services performed; that the rate to Augusta is the same as to Atlanta, for the reason that such rate is governed by the rate from Baltimore and New York to Augusta, and made on a lower basis than the rates to Atlanta, on account of water competition via Charleston, S. C., and Savannah, Ga., which operates to lower such rate to Augusta. The relative distance hauled, and the proportionate amount of services performed by this defendant, in carrying said goods to Augusta, being less than the distance and service to Atlanta, the compensation of this defendant is relatively less. As to the rate to Social Circle, Georgia, defendant says that such rate can only be made by this defendant by consent and permission of the Georgia Railroad Company, codefendant herein; that the transportation to said Social Circle can only be effected by the co-operation of the said Georgia Railroad, said Social Circle being a station on its line, and the said Georgia Railroad stipulating and insisting that the said rate shall be 30 cents greater than the rate to Augusta and Atlanta. This defendant receives no part of, or allowance on account of, the 30 cents additional charged to Social Circle, the same being purely a local rate charged by the Georgia Railroad for transportation over its line from Atlanta to Social Circle."

There seems to have been very little evidence in the case before the commission. As it appears from the report of the case, only one witness was introduced, who was an officer of one of defendant companies. The facts were principally ascertained by the admission of the parties and from the records, and, presumably, from the tariffs of rates, etc., filed with and in the possession of the commission. The serious question presented to the commission in this

case was the right of the defendant railroad companies to charge more for shipments of first-class freight from Cincinnati to Social Circle than from Cincinnati to Augusta. The Cincinnati, New Orleans & Texas Pacific Railway runs from Cincinnati, in the state of Ohio, to Chattanooga, in the state of Tennessee, a distance of 336 miles; the Western & Atlantic Railroad runs from Chattanooga, in the state of Tennessee, to Atlanta, in the state of Georgia, a distance of 138 miles; the Georgia Railroad runs from Atlanta to Augusta, Georgia, a distance of 171 miles. Social Circle is a town on the line of the Georgia Railroad, 52 miles east of Atlanta, and 119 miles west of Augusta, Georgia; and consequently a shorter distance by the last-named number of miles from Cincinnati than is Augusta.

The contention was that the charge of $1.31, from Cincinnati to Social Circle, per 100 pounds, on first-class freight, when only $1.01 per 100 pounds on similar freight was charged from Cincinnati to Augusta, was in violation of the long and short haul clause in section 4 of the act to regulate commerce, approved February 4, 1887, and known as the "Interstate Commerce Act." The order of the commission in the case is given in full, and is as follows:

"It is ordered and adjudged that the defendants, the Cincinnati, New Orleans & Texas Pacific Railway Company, the Western & Atlantic Railroad Company, and the Georgia Railroad Company, do, from and after the 20th day of July, 1891, wholly cease and desist from charging or receiving any greater compensation in the aggregate for the transportation in less than car loads of buggies, carriages, and other articles classified by them as freight of first class, for the shorter distance over the line formed by their several railroads from Cincinnati, in the state of Ohio, to Social Circle, in the state of Georgia, than they charge or receive for the transportation of said articles in less than car loads for the longer distance over the same line from Cincinnati, aforesaid, to Augusta, in the state of Georgia; and that said defendants the Cincinnati, New Orleans & Texas Pacific Railway Company and the Western & Atlantic Railroad Company do also, from and after the 20th day of July, 1891, wholly cease and desist from charging or receiving any greater aggregate compensation for the transportation of buggies, carriages, and said other first-class articles in less than car loads, from Cincinnati aforesaid, to Atlanta, in the state of Georgia, than one dollar ($1.00) per 100 pounds."

In the case before this court each and all of the defendants filed answers, which, in addition to the matter set up in their answers in the case before the commission, are substantially as follows: The defendant Georgia Railroad Company admit that the proceedings before the interstate commerce commission were as stated in the petition here, but they deny that it was made to appear that the provisions of the act to regulate commerce had been violated by them in the respects charged in the petition before the commission, or that the matters in controversy had been legally determined by the commission; and they deny the legal or binding effect of the order passed by the commission.

The answer of the Cincinnati, New Orleans & Texas Pacific Railway Company is substantially the same as that of the Georgia Railroad Company.

The answer of the Western & Atlantic Railroad Company contains the following:

"That on the 27th of December, 1890, it became a body corporate under the name and style of the Western & Atlantic Railroad Company, under an act of the legislature of Georgia approved November 12, 1889, which provided for the lease of certain property of the state of Georgia known as the Western & Atlantic Railroad; and that prior to said 27th day of December, 1890, this respondent was not in existence, and therefore had no notice of the proceedings before the interstate commerce commission in the matter of the petition of the James & Mayer Buggy Company, and had no connection with the matters therein complained of."

(Subsequently, by agreement, the present Western & Atlantic Railroad Company was made party defendant in lieu of the old company.)

So that the matters for determination here, as will be perceived, are:

(1) Whether or not the charge of a greater rate for transporting first-class freight in less than car-load lots, per 100 pounds, from Cincinnati, Ohio, to Social Circle, Ga., than is charged for transporting the same class of freight to Augusta, Ga., a point 119 miles beyond, over the same line, and in the same direction, is a violation of the fourth section of the interstate commerce act.

(2) Whether or not the charge of $1.07 on first-class freight per 100 pounds, in less than car-load lots, from Cincinnati to Atlanta, Ga., is unreasonably high, and a violation, for that reason, of the act to regulate commerce.

1. The commission, in the beginning, denies the power of this court to hear the case upon any other issues, pleadings, or facts than those presented to the commission. It is claimed that the case is to be determined with reference to what the interstate commerce commission had before it, and that no additional issues or questions should be raised, or other evidence taken. The language of the act of congress does not support this contention. Section 16, which provides for the enforcement of the orders of the commission by and through the courts, is in these words:

"And said court shall proceed to hear and determine the matter speedily, as a court of equity, and without the formal pleadings and proceedings applicable to ordinary suits in equity, but in such manner as to do justice in the premises; and to this end such court shall have power, if it think fit, to direct and prosecute in such mode, and by such persons, as it may appoint, all such inquiries as the court may think needful to enable it to form a just judgment in the matter of such petition; and on such hearings, the findings of fact in the report of said commission shall be prima facie evidence of the matters therein stated."

It is impossible to believe that under this language of the act the powers of the court in the premises are restricted, as contended for by the commission. The provision, "if it think fit, to direct and prosecute in such mode, and by such persons, as it may appoint, all such inquiries as the court may think needful," etc., must necessarily authorize the court to provide for the taking and hearing of such additional evidence as may be proper; and the power is equally clear to permit such pleadings as will bring before the court clearly and in legal form such matters as may be pertinent and proper, in view of the issues raised.

In the case of Kentucky & I. Bridge Co. v. Louisville & N. R. Co. 37 Fed. Rep. 567, Judge Jackson, discussing this question, on page 614 uses this language:

"The suit in this court is, under the provisions of the act, an original and independent proceeding, in which the commission's report is made prima facie evidence of the matters of fact therein stated. It is clear that this court is not confined to a mere re-examination of the case as heard and reported by the commission, but hears and determines the cause de novo, upon proper pleadings and proofs; the latter including not only the prima facie facts reported by the commission, but all such other and further testimony, as either party may introduce, bearing upon the matters in controversy."

See, also, Interstate Commerce Commission v. Lehigh Val. R. Co., 49 Fed. Rep. 177, and Interstate Commerce Commission v. Atchison, T. & S. F. R. Co., 50 Fed. Rep. 295. In the latter case the court holds:

"On the proceedings in the circuit court, under section 16, to enforce an order of the commission directing certain carriers to desist from charging greater rates for the shorter than the longer haul, the facts found by the commission are not conclusive, but merely prima facie," etc.

This question may be considered, therefore, as settled, not only by the language of the act of congress, but by authority, against the position assumed by counsel for the commission.

2. The next question raised here is as to whether the carriage of freight in the case now before the court by the Georgia Railroad was such a carriage as to bring the shipment from Cincinnati to Social Circle within that part of the first section of the act to regulate commerce, which is as follows:

"That the provisions of this act shall apply to any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used under a common control, management, or arrangement, for a continuous carriage or shipment."

The position assumed is that there is no such arrangement for the "continuous carriage or shipment" between the Georgia Railroad Company, the Western & Atlantic Railroad Company, and the Cincinnati, New Orleans & Texas Pacific Railway Company as to bring the Georgia Railroad Company within the terms of the act.

The facts appear to be that goods were shipped from Cincinnati to Social Circle, on through bills of lading, issued by the Cincinnati, New Orleans & Texas Pacific Railway Company, and were carried over the Cincinnati, New Orleans & Texas Pacific Railway, the Western & Atlantic Railroad, and the Georgia Railroad, to Social Circle. The rate charged on first-class goods, such as were involved in this controversy, is $1.07, being the through rate from Cincinnati to Atlanta, with the local rate of 30 cents per 100, from Atlanta to Social Circle, over the Georgia Railroad, added thereto, making $1.37. The rate charged from Atlanta to Social Circle is the rate authorized by the railroad commission of Georgia, and is the regular rate for local freight between those two points. When the freight is collected, the Georgia Railroad retains its

entire local rate, and the remainder of the $1.07 is divided between the other two roads, in proper proportion, according to an agreement between them.

The decision and order of the commission in this case was made on the 29th day of June, 1891. On the 3d day of July, the following circular was issued by the Georgia Railroad:

"Augusta, Ga., July 3d, 1891.

"(Circular No. 106, New Series.)

"To Connections—Dear Sir: Lately we have had some complications, arising from connecting lines and their connections issuing through bills of lading, quoting rates to our local stations; and to avoid such complications in the future we earnestly request that hereafter, in issuing bills of lading to our local stations, no rates be inserted east of Atlanta. This, of course, does not apply to business to Athens, Gainesville, Washington, Milledgeville, Augusta, or points beyond. Please issue instructions to your agents that this rule will be effective at once, and advise me if you will comply with this request.

"Yours, truly, E. R. Dorsey, General Freight Agent."

In addition to this, it is entirely clear from other evidence that the Georgia Railroad insists on its local rate from Atlanta, to points on its line between Atlanta and Augusta, on all freight shipped from Cincinnati. According to all the evidence, there is no agreement on the part of the Georgia Railroad for any such joint tariff as implies a reduced rate from points in the west to points on its line except to Augusta. The contention for this company therefore is, and, in effect, in behalf of all the defendants, that there is no such arrangement for a continuous shipment as brings the freight charge in this case to Social Circle within the language of the first section of the act to regulate commerce, above quoted, and which controls the character of transportation to which the act applies. In this connection, the case of Railway Co. v. Osborne, 52 Fed. Rep. 912, 3 C. C. A. 347, is interesting, and applicable. The decision in that case is by the circuit court of appeals for the eighth circuit, Justice Brewer delivering the opinion of the court. The action in the court below was to recover damages for violation of the "long and short haul" clause of the interstate commerce act. The facts, as stated by Justice Brewer, in that case, are as follows:

"The defendant owns and operates a railroad from Missouri Valley, a town on the western border of Iowa, to Chicago, Illinois. Scranton is a town in Iowa, on the line of this road, eighty-eight miles east of Missouri Valley, and therefore so much nearer Chicago. The Fremont, Elkhorn & Missouri Valley Railroad Company owns a railroad running east and west through Nebraska, and connecting with the defendant's road at the town of Missouri Valley. Blair, Nebraska, is a point on that road, thirteen miles west of Missouri Valley. While the Fremont, Elkhorn & Missouri Valley Railroad Company is an independent corporation, a majority of its stock belongs to the defendant company, and thus the defendant company controls its operations. During the month of January, 1888, there was in force a local tariff of rates charged on the defendant's road. This local tariff was duly published in Scranton. In accordance with it, the rate from Scranton to Chicago, on corn, was 18 cents per 100 pounds. All shippers shipping simply to Chicago paid that rate. The plaintiff, among others, made sundry shipments, and was charged and paid such sum. There was, so far as appears, absolute uniformity of rate as to all such local shipments. At the same time the tariff on corn shipped through from Blair, Nebraska, to New York City was 38½

cents; to Boston, Philadelphia, and Baltimore, sums slightly above and below this figure. This through rate was made up in this way: By agreement between the defendant and eastern companies, corn was shipped through to New York from Turner and Rochelle, two small stations on the defendant's road, one 30 and the other 70 miles west of Chicago, for 27½ cents, 3½ cents of which went to defendant and the balance to the eastern companies; and by agreement between the defendant and the Fremont, Elkhorn & Missouri Valley Railroad Company the rate from Blair to Turner and Rochelle, on corn shipped to New York, Boston, Philadelphia, or Baltimore, was 11 cents. In other words, by these agreements of the several companies, a through rate was fixed on corn shipped from Blair to New York and other eastern cities; and of that through rate the defendant company received, for carrying the whole line of its road, less than the local tariff of 18 cents, charged from Scranton to Chicago. This joint tariff was not published at Scranton, and no knowledge of it was given to or possessed by the plaintiff until February 24th, and until that time he made no application for shipment beyond Chicago. Thereafter he shipped to Boston, and received the benefit of a through tariff."

According to the decision in that case, upon the statement of facts just quoted, it is entirely clear that by the joint arrangement of the Cincinnati, New Orleans & Texas Pacific Railway Company, the Western & Atlantic Railroad Company, and the Georgia Railroad a new and independent "line" was formed by the adoption of a joint through tariff from Cincinnati to Augusta, and that this line was distinct and separate, viewed in the light of the "long and short haul clause," from that of either of the railroads named. The court, in that case, distinguished clearly and satisfactorily between the term "railroad" as used in the other parts of the act, and the term "line," as used in the fourth section. The language of the court on this subject, on pages 915, 916, 52 Fed. Rep., and pages 350, 351, 3 C. C. A., is as follows:

"The denunciation of the fourth section is against each separate common carrier for its violation of the 'long and short haul' clause on its own line. The language is: 'That it shall be unlawful for any common carrier, subject to the provisions of this act, to charge or receive any greater compensation, in the aggregate, for the transportation of passengers, or of the like kind of property, under substantially similar circumstances and conditions, for a shorter than for a longer distance, over the same line, in the same direction, the shorter being included within the longer distance.' The use of the word 'line' is significant. Two carriers may use the same road, but each has its separate line. The defendant may lease trackage rights to any other railroad company, but the joint use of the same track does not create the 'same line,' so as to compel either company to graduate its tariff by that of the other. Further, by section 6, every common carrier is required to print, and publish at every depot along its own road, schedules, showing its rates and fares and charges. There is a prohibition against advancing rates without giving notice, and, in case of a reduction, notice thereof must be immediately posted; whereas, in reference to joint tariffs, the requisition is simply that each common carrier furnish to the commission a copy of all contracts therefor, as well as copies of the joint tariffs; and power is given to the commission to determine the amount of publication that shall be required. Again, at the time of the passage of this act joint through tariffs were well known, as well as the fact that they were generally less than the sum of the local tariffs, and not distributed between the several companies making them according to the mere matter of mileage. In this act joint tariffs are recognized; and if congress had intended to make the local tariffs subordinate to or measured by the joint tariff, its language would have been clear and specific. It is worthy of note that in the debates which attended

the passage of this bill through the two houses, and while this matter was under discussion, it was again and again said by those participating in the debates that the line formed under the joint tariff of connecting companies was one separate and independent from that of either of the connecting companies; and also worthy of note that in the actual administration of affairs by the interstate commerce commission the same thing has been constantly recognized."

The question, then, is: Does the fact that goods are shipped through from Cincinnati to Social Circle, that a through rate of freight is given by the initial carrier, that the goods are continuously transported over the three roads until they arrive at Social Circle, make it transportation subject to the fourth section of the interstate commerce act, notwithstanding the fact that the Georgia Railroad insists upon and receives its local rate, and has no arrangement for a joint tariff from Cincinnati to Social Circle, except that it allows the initial road (Cincinnati, New Orleans & Texas Pacific Railway) to make the rate as has been indicated, and in which it acquiesces by receiving the goods and delivering them at Social Circle? In the Osborne Case, above quoted, it is said:

"Neither company is bound to adjust its own local tariff to suit the other, nor compellable to make a joint tariff with it. It may insist upon charging its local rates for all transportation over its line."

Further on, this language is used:

"No power exists at common law, and none is given by the act to court or commission, to compel connecting companies to contract with each other, to abandon full control of their separate roads, or to unite in a joint tariff."

This correctly states the act of congress, and no railroad is compelled to enter into a through rate arrangement for transportation, unless it desires to do so. The fact runs through all the evidence in this case, appearing sometimes in the direct and sometimes brought out by cross-examination, that the rate from Cincinnati to Social Circle is a combination of a through rate from Cincinnati to Atlanta and the local rate of the Georgia Railroad from Atlanta to Social Circle. There is no difference as to shipments over the Georgia Railroad, to local stations, whether the goods come from Cincinnati, or whether the shipments originate in Atlanta; the rate is precisely the same; and as to the Georgia Railroad, so far as appears, the carriage is the same. A joint tariff for through traffic, such as will make a "new" or "independent" line, under the decision in the Osborne Case, supra, would seem to be charges made on a different basis, and usually—perhaps invariably—at a less rate than that of the sum of the local rates of the lines entering into the joint arrangement. If this be true, then the rate from Cincinnati to Social Circle would not be such a joint rate or joint tariff as makes a "new line," as indicated in the decision named. There must be a "common arrangement" between the roads making the "new line," and there is no such "common arrangement" by the Georgia Railroad as to traffic to its local stations. There is express refusal to make any "common arrangement," if evidence is to have any weight. The evidence shows no express agreement, and none can be fairly implied from the facts. Justice Brewer, in the Osborne Case, makes this qualification:

"That we may not be misunderstood, we do not mean to intimate that the two companies, with a joint line, can make a tariff from Turner to Cleveland higher than from Turner to Buffalo, or to any intermediate station between Cleveland and Buffalo; for when the two companies, by their joint tariff, make a new and independent line, that new and independent line may become subject to the long and short haul clause. But what we mean to decide is that a through tariff on a joint line is not the standard by which the separate tariff of either company is to be measured or condemned."

It is contended in the argument here that the effect of this restrictive language, as applied to this case, is that, when the three railroads formed a line from Cincinnati to Augusta, by entering into a joint tariff for the transportation of goods between those points, no more could be charged for a haul from Cincinnati to any point between Atlanta and Augusta than was charged from Cincinnati to Augusta, and that no more could be charged from Cincinnati to any point between Chattanooga and Atlanta than was charged from Cincinnati to Atlanta. But, applying the Osborne Case here: The Lake Shore Railroad runs from Chicago to Buffalo; and Cleveland, although a large city, is an intermediate station on that road. The joint rate in the Osborne Case was made to Cleveland, the intermediate station; and that decision holds that, where a railroad made a reduced joint rate to an intermediate station on its line of road, it could not charge less to any point beyond. The Lake Shore road had become part of a "new and independent line," although the "new and independent line," so far as the Osborne Case is concerned, was to Cleveland. The facts in that case are, therefore, entirely different from the facts in this case; and the qualifying language of Justice Brewer does not seem to have any application here. The decision in the Osborne Case has been quoted and applied, however, in one of the district courts since it was rendered. The case of U. S. v. Mellen, 53 Fed. Rep. 229, decided by Judge Riner, in the district court for Kansas, November 28, 1892, was an indictment against Mellen and others for a violation of the long and short haul clause of the interstate commerce act, and the decision of the court there, so far as applicable here, may be gathered from the first two headnotes, which are as follows:

"(1) The long and short haul clause of the interstate commerce act (section 4) does not apply to a case where the short-haul rate is the combined local rates of two connecting lines, and the long-haul rate is a joint rate made by the two lines, acting together; and an indictment alleging such rates is bad. Railway Co. v. Osborne, 52 Fed. Rep. 912, 3 C. C. A. 347, followed.

"(2) An indictment alleging that the share of the joint rate taken by one company is less than its local rate for a shorter haul, etc., is bad. Railway Co. v. Osborne, 52 Fed. Rep. 912, 3 C. C. A. 347."

In the Mellen Case the indictment alleged substantially, taking all the counts together, that the defendants were agents of the Union Pacific Railway Company, and officers who had authority to establish rates of freight on the lines of said company, and that on the 20th April, 1891, the Union Pacific Railway Company had entered into an arrangement with the Southern Pacific Railroad Company, also a common carrier, both being subject to the act to regulate commerce, and established a rate or joint tariff for the transportation of refined sugar by the two lines of railroad named

from San Francisco, Cal., to Kansas City, Mo.; that the rate under this joint tariff is 65 cents per 100 pounds from San Francisco to Kansas City, and that of this the Union Pacific received 32.4 cents, and the Southern Pacific 32.6 cents.  It is further charged that the city of Salina is a station on the main line of the Union Pacific Railway Company, in Kansas, and is located 186 miles west of Kansas City, Mo., and a shorter distance from San Francisco by 186 miles.  The indictment then charges the defendant with willfully establishing a rate of 94 cents for each 100 pounds of refined sugar, in car-load lots, transported or carried over the Union Pacific and the Southern Pacific, from San Francisco, Cal., to Salina, Kan., notwithstanding the rate of 65 cents per 100 pounds to Kansas City, Mo.  Then the charge is made that these shipments were "made under similar circumstances, and conditions" to each place.   The court sustained a motion to quash the indictment on all the counts in the indictment except one; and the count sustained alleged a shipment from Ogden at a greater charge, in the aggregate, for the shipment from Ogden to Salina, than was charged from Ogden to Kansas City.   Of that the court says:

"In this count of the indictment there is no allegation of a joint rate to Kansas City, Missouri; and a joint rate is not made the basis by which the reasonableness of the local rate is to be determined, hence does not come within the principle announced in the case of Railway Co. v. Osborne."

Afterwards, in the opinion, the court, in speaking of the count which is sustained, says:

"If, however, upon the trial of the cause it should be made to appear by the evidence that the joint rate to Kansas City was made the basis of adjusting the local rates charged in this count of the indictment, the defendant would be entitled to acquittal."

That case is exactly in point here except that there were only two roads involved there, while there are three here.   The facts there were that the goods were received for shipment by the Southern Pacific, and were carried over its line from San Francisco to Ogden, and from Ogden, over the Union Pacific, to Kansas City. The rate from San Francisco, over the entire distance, to Kansas City, was 65 cents, while the rate from San Francisco to Salina, a station intermediate between Kansas City and Ogden, was 94 cents.   It will be seen, therefore, that for the purpose of applying the principle ruled in the Osborne Case, the Case of Mellen and others, and the case here, are exactly alike.   Judge Riner, in the Mellen Case, says in the opinion:

"The allegation is that they charged the local rate from Ogden to Salina, which was *less* than their part of the joint rate to Kansas City, although Salina was a shorter distance.  This, I think, they may do, for the reason already suggested.  The joint rate does not, in any sense, affect or govern the local rates to intermediate points.  While, as stated by Mr. Justice Brewer, the two companies could not make a joint rate from San Francisco to Kansas City which was less than a joint rate from San Francisco to Salina, yet they may make a joint rate to Kansas City, Mo., and that fact would not affect the local rate of either company to Salina."

(The word "less," italicized in the quotation, should evidently have been "more," as the report of the case shows that the rate

from Ogden to Salina was 61 cents, which was more than the Union Pacific's part of the joint rate of 65 cents from San Francisco to Kansas City.)

The foregoing decisions, which seem to properly construe the interstate commerce law, are conclusive of the matter now being considered, viz. whether the rate from Cincinnati to Social Circle, as shown in this case, can be compared with the rate from Cincinnati to Augusta, for the purpose of making the question presented under the "long and short haul clause" of the act to regulate commerce. The conclusions of the court, therefore, are:

First. That the traffic from Cincinnati to Social Circle, in issue here, as to the Georgia Railroad Company, is local, and that company is not, on the facts presented, made a party to a joint or common arrangement, such as makes the traffic to Social Circle subject to the control of the interstate commerce commission.

Second. That the arrangement for a through rate—for there is unquestionably a joint tariff from Cincinnati to Augusta—constitutes a "new line" between Cincinnati and Augusta; and, following Railway Co. v. Osborne, supra, and U. S. v. Mellen, supra, traffic to a local point on the Georgia Railroad at strictly local rates cannot be compared with traffic over the "new line" from Cincinnati to Augusta, for the purpose of raising the question under the long and short haul clause of the interstate commerce act. If this be not true, then a railroad must refuse to receive freight which comes over other lines of railroad, and destined to local points on its road, for which the initial carrier has issued a through bill of lading, or, by receiving it, it must become a party to a joint arrangement. This result could not have been in contemplation by congress in passing this act, and no fair interpretation of its terms, or view of its intent, can lead to such a conclusion.

3. If the foregoing views are correct, it is unnecessary to go at any great length into the question so elaborately and so ably argued in this case as to the meaning of the words, "under substantially similar circumstances and conditions," contained in the fourth section of the act to regulate commerce, and its application to the facts of this case, namely, the charge of $1.37 to Social Circle, and the less charge of $1.07 to Augusta, the more distant point. Since the passage of this act, and, indeed, before the bill which resulted in the act became a law, there has been much discussion as to the meaning of this phrase. Widely different views have been entertained since the passage of the act, certainly, as to its meaning.

Taking the prohibitory part of the section in connection with the proviso, it has been insisted, on the one hand, that the phrase, "under substantially similar circumstances and conditions," referred to such conditions and circumstances as were connected immediately with the transportation of the goods,—connected with their carriage over any lines of roads,—and that, if extrinsic circumstances or conditions would justify the greater charge for the shorter than for the longer haul in any case, the right to make it

could only be obtained by first applying to the commission for its approval. The other view has been that this phrase included other circumstances and conditions than those connected with the carriage of the goods, and that embraced in such circumstances and conditions was competition. A further contention is that the court should give effect to this entire section, and that not only the main or prohibitory part of the section should be considered, but also the proviso, and that the court must attribute to congress an intent to give meaning to every part. The rule of construction claimed is undoubtedly correct. A part of the recognized history of this act, however, is that the proviso formed part of the bill before the words, "like kind of property, under substantially similar circumstances and conditions," were inserted therein. If the section had been left without these last-mentioned words, thereby establishing a hard and fast rule as to the long and short haul, the proviso would have clothed the commission with great power over the subject-matter of the section. But, after the introduction of the phrase, "under substantially similar circumstances and conditions," the authority of the commission was undoubtedly very greatly restricted, and much more was left to the judgment and determination of the carrier in the first instance. But, even after the insertion of the qualifying clause named, it was doubtless considered that the retention of the proviso was necessary, as special cases would arise requiring relief from the operation of the rule, even where the circumstances and conditions were substantially similar.

Judge Cooley, speaking for the interstate commerce commission, in Re Louisville & N. R. Co., 1 Inter St. Commerce Com. R. 53, states the question, and the general view the commission entertained as early as June, 1887, in this way:

"The Louisville & Nashville Railroad Company was one of the first to apply for relief under the fourth section of the act to regulate commerce, which, after declaring the general rule that more shall not be charged or received, in the aggregate, by a common carrier subject to the law, for the transportation of passengers, or of the like kind of property, under substantially similar circumstances and conditions, for a shorter than for a longer distance, over the same line in the same direction, the shorter being included in the longer, proceeds then to authorize exceptions, and confers upon the commission certain powers in respect thereto. From the first there have been two opinions regarding the proper construction of this provision for exceptions, one view being that no exception can be lawful unless made with the sanction of the commission; and the other,—apparently better supported on the words of the statute,—that an order of relief is not required when the circumstances and conditions are substantially dissimilar, since the carrier, in acting upon them, would commit no breach of law, though it would be responsible in case it were found that the circumstances and conditions were misconceived, or misjudged. Under this last view the order for relief would be needful only when the case was not one of plainly dissimilar circumstances and conditions, but in which, nevertheless, there might be reasons and equities that would sanction such greater charge."

Afterwards, in that opinion, the commission restricted the class of competition which would constitute dissimilar circumstances and conditions to competition with Canadian railroads, with water lines of transportation, and, with some qualifications, (which were

afterwards removed,) to competition with railroads wholly within a state. It was also held in that opinion that competition with other lines of railroad subject to the act would not, as a general thing, constitute such competition as would create dissimilar circumstances and conditions, but that there might be "rare and peculiar cases" which would do so. As to these four classes of competition, namely, competition with Canadian roads, with water lines, with roads wholly within a state, and in "rare and peculiar cases" with railroad lines subject to the commission, the carriers might, each for itself, treat them as constituting dissimilar circumstances and conditions, and make the greater charge for the shorter haul, without first obtaining the consent of the commission. As to other cases the consent of the commission was deemed necessary. In the case of Georgia Railroad Commission v. Clyde Steamship Co., the commission overruled so much of the decision in Re Louisville & N. R. Co. as allowed the carrier to judge in the first instance of the "rare and peculiar cases" of competition with railroads subject to the act, and thereby justify itself in the charge of a greater rate for the shorter than for the longer haul. The general construction of this clause, which admits competition as constituting dissimilar circumstances and conditions, is fully sustained by decisions of the circuit courts in cases which will be referred to, and which decisions are more comprehensive than the decisions of the commission. It appears to be settled, so far as decisions have been rendered, and construction given this clause, that the broader of the two opposing views above referred to must be taken of the phrase, "under substantially similar circumstances and conditions," and that competition, generally speaking, must be considered in applying this phrase in any given case.

The question which has been argued so extensively here is whether competition of carrier with carrier, both subject to the terms of the act, and competition of market with market, is such competition as will constitute dissimilar circumstances and conditions. The substance of the expressed views of the commission on this subject is that competition between two carriers, both subject to the act, will not of itself constitute dissimilar circumstances and conditions; that it will not, presumptively, at least. The opinion of the commission seems to be that, where a carrier claims that competition with another carrier, both being subject to the act, is such as to justify it in making a greater charge for the shorter than for the longer haul, the commission can do much, by the exercise of its general powers of supervision over rates, in relieving the complaining carrier of such competition. At all events, it is clearly held that competition between carriers subject to the act will not be presumed to justify a less charge for the longer haul than for the shorter haul by the carrier of its own motion, but that the right to do so must be granted by the commission.

The commission has decided that it has no authority to raise rates. It holds that it was not the intention of congress to grant any such power, and the commission so determined, in Re Chicago, St. P. &

K. C. Ry. Co., 2 Inter St. Commerce Com. R. 231. If the carrier, subject to the act, is met with competition from other carriers, also subject to the act, and the commission has no authority to require such other carriers to increase their rates, even when the competition is ruinous, where is the practical difference between such a case and the case of competition with carriers not subject to the act? If a line of railroad running along the northern boundary of our country is met with competition from Canadian railroads running parallel with it, the American railroad can treat such competition as a circumstance and condition justifying a less charge for the longer haul to a competitive point than it makes for the shorter haul to a noncompetitive point; but a line of railroad running through the interior of our country, and interstate, which meets with competition from another line of railroad running parallel with it, and interstate also, may not treat such competition as a circumstance and condition justifying a less charge for the longer haul to a competitive point than for the shorter haul to a noncompetitive point on its line, notwithstanding the fact that it can have no direct relief for such competition. In the first-named case,—that is, competition with the Canadian road,—the American road may, of its own motion, treat such competition as a dissimilar circumstance and condition; while the line of road running into the interior must await the action of the commission until it can ascertain whether, by examination and revision of rates of the line of which complaint is made, any relief can be afforded to the complaining line. Such condition of affairs could hardly have been contemplated by congress in the passage of this act. If the general conclusion is correct that competition will constitute dissimilar circumstances and conditions, in the sense in which that term is used in the act, there seems to be no good reason for drawing the line where it has been drawn by the commission; but, on the contrary, it does seem that competition of carrier with carrier, both subject to the act, is as much within the terms of section 4 as competition with the carrier not subject to the act. This section, and especially this clause, was before Judge Deady in the United States circuit court for Oregon. Ex parte Koehler, 31 Fed. Rep. 315. The decision was on the petition of a receiver for instructions as to his duty under the act, and under this clause in section 4. Judge Deady, in holding that competition must be considered, uses this language:

"The judgment of the court is authority, then, for this proposition: Two or more corporations, in order to meet competition, may form a through line, and charge through rates for transportation thereon, which may be less than the sum of the local rates of the several roads constituting the line; and the portion of the through rate received by each corporation may be less than the local rate charged by said corporation for carrying freight over the whole length of its road. The interstate commerce act is intended, among other things, to prevent discrimination between long and short hauls, except where they are made under substantially dissimilar circumstances and conditions. In my judgment, congress, in limiting the prohibition contained in section 4 of the act against discriminating charges between long and short hauls to cases where such hauls are made 'under substantially similar circumstances and conditions,' has recognized the rule laid down in Ex parte

Koehler as a proper one. Freight carried to or from a competitive point is always carried under 'substantially dissimilar circumstances and conditions' from that carried to or from noncompetitive points. In the latter case the railway makes its own rates, and there is no good reason why it should be allowed to charge less for a long haul than for a short one. When each haul is made to or from a noncompetitive point, the effect of such discrimination is to build up one place at the expense of the other. Such action is willfully unjust, and has no justification or excuse in the exigencies or conditions of the business of the corporation. In the former case, the circumstances are altogether different. The power of a corporation to make a rate is limited by the necessities of the situation. Competition controls the charge. It must take what it can get, or, as was said in Ex parte Koehler, 'abandon the field, and let its road go to rust.' Competition may not be the only circumstance that makes the condition under which a long and short haul are performed substantially dissimilar; but certainly it is the most obvious and effective one, and must have been in contemplation of congress in the passage of the act."

In the case of Missouri Pac. Ry. Co. v. Texas & P. Ry. Co., 31 Fed. Rep. 862, which was also on the application of a receiver for instructions, Judge Pardee ruled as follows:

"Under section 4 of the interstate commerce law, relating to the charges for long and short haul, it seems that, where the circumstances and conditions are dissimilar, there is no prohibition; where the circumstances and conditions are similar, the prohibition attaches; and that where it is difficult to point out clearly the circumstances or conditions which produce the dissimilarity the doubt should go in favor of the object of the law, and the circumstances and conditions should be taken as substantially similar. Where the circumstances and conditions are similar, or substantially similar, and the result to the carrier is injurious, relief can be had only through the commission. The bulk of the petition presented, of the evidence, and of the master's report, is an argument against the interstate commerce act, and a rather vivid showing of the disastrous effects of an enforcement of the act, with the popular construction given to the long and short haul clause, so far as the lines of the Texas & Pacific Railway are concerned; and, if any specific question is presented for the answer of the court, it is whether competition between carriers is a circumstance or condition of the carriage, in the sense in which those words are used in the fourth section of said law. The effect of the enforcement of the law upon the particular property in the hands of the receiver need not be considered when the whole question is one of how to comply with the law. That competition—the life of trade—cuts an important figure in the conditions and circumstances attendant upon the transportation of passengers and property cannot be well overlooked nor denied. Nor can it well be denied that, as between the long and short haul, competition may exist to that extent that what would otherwise be similar circumstances and conditions will be dissimilar circumstances and conditions. Whether in any particular case there is that competition on the long haul that will justify a lower charge for the long haul than is charged for the short haul, under otherwise similar circumstances and conditions, must be determined on the facts of the particular case, keeping in mind that, where the matter is not clear, the object and policy of the law should prevail. As to competition, and its effects, and generally as to the question under the said interstate commerce act, the receivers are referred to the late decision of the commission upon the petition of the Louisville & Nashville and other railroads, delivered June 16th inst. This decision is elaborate, and well considered, and answers all the points made by receiver's petition herein, as specifically as their general nature will permit. The lights furnished by the commission, with a disposition to enforce the law, (giving the same an enlightened and liberal construction, to the end that the mischiefs at which the law is aimed may be prevented, without unnecessary injury to any species of property,) ought to be sufficient to guide any railroad traffic man-

ager, and to enable him to protect himself, and his company, against any serious complaint of unjust discrimination, or unlawful conduct."

In the case of Interstate Commerce Commission v. Atchison, T. & S. F. R. Co., 50 Fed. Rep. 306, Judge Ross, in the opinion, uses this language:

"The common carrier cannot be required to ignore or overcome existing differences in the transportation facilities of different localities, created not by its own arbitrary action, but by nature, or by enterprise beyond its control. San Bernardino is situated in one of the most fertile and productive valleys in the world, and is a thriving and prosperous city, but it has not the transportation facilities that Los Angeles has. It is about 60 miles distant, and further inland. By reason of its nearness to Los Angeles, it receives the benefit of the competitive rates to that terminal, in proportion to its proximity thereto. But, not being a competitive point, it does not get the terminal rates. The proof shows, what is also a matter of common knowledge, that railroad companies do not make terminal rates unless compelled to do so by competition. Wherever and whenever actual competition exists, the question the carrier has to deal with is not so much what is a fair rate for the service, or what the traffic will bear, but what rate can be got for the service, as against the rate offered by the competitor. Especially is this true when the competitor is a carrier by water, because that is the cheapest known kind of transportation, and is unrestricted by law. If, therefore, Los Angeles can be justly regarded as a competitive point in respect to the transportation of the commodities here in question, there is such dissimilarity of circumstances and conditions between it and the intermediate point of San Bernardino as to make the long and short haul clause of the interstate commerce act inapplicable."

Judge Shiras took a different view of this clause in Osborne v. Railway Co., 48 Fed. Rep. 54, when it was tried before him. His view of its meaning will appear from this quotation from his charge to the jury:

"Whether the railway company was justified by a cut rate in making what was called in argument 'illegitimate competition,' and circumstances of that kind, which grew out of the handling and management of the railroad business of the country by other competing lines, and its effect upon the business of the defendant company, in the judgment of the court is a question that cannot be submitted to you. Questions of that kind are for the judgment and determination of the board of commissioners appointed under this act, and the courts and juries, when they are called to act upon particular cases arising under this act, where it is claimed that the law has been violated, are only authorized to determine the question whether, in the service rendered, the character of the property, its conveyance, and other facts which inhere in the carrying of the freight upon the particular line which is charged with the wrongdoing, there existed dissimilar circumstances and conditions relieving the company from the charge of collecting a larger rate for the shorter haul over the same line, in the same direction, and under otherwise substantially similar circumstances and conditions."

The case was reversed in the circuit court of appeals, Justice Brewer delivering the opinion, (52 Fed. Rep. 912, 3 C. C. A. 347,) but the reversal was on the question of what constituted the "same line," and not because of any error in the charge of Judge Shiras on this ground. There is no discussion whatever of the phrase, "under substantially similar circumstances and conditions," in the opinion by Justice Brewer for the appellate court. If the question was raised at all, it appears to have been passed without any decision.

It is contended on behalf of the commission that the case of Ex parte Koehler, and the San Bernardino Board of Trade Case, 4 Inter St. Commerce Com. R. 104, were decided solely with reference to water competition; but by an examination of the facts of those cases, and of the views of the court as expressed in the opinions, it will be found that this contention is not justified. Both cases, as is true also of the case of Missouri Pac. Ry. Co. v. Texas & P. Ry. Co., appear to treat competition generally as embraced within the term "similar circumstances and conditions," and do not restrict this competition to competition with water lines.

4. The question of competition of market with market, as constituting dissimilar circumstances and conditions, has been considerably discussed in this case.   In the opinion by Commissioner Morrison in this case (James & Mayer Buggy Co. v. Cincinnati, N. O. & T. P. Ry. Co., 4 Inter St. Commerce Com. R. 744) the commission alludes to competition of market with market in this way:

"If the contention of the defendants is justified by the statute, and they can avail themselves of its exceptional provisions, and charge more for the shorter distance, for the purpose of equalizing commercial conditions and adjusting trade relations between the cities of Cincinnati and Baltimore in the Augusta market, the same thing may be done to place Cincinnati carriage makers on an equal footing with those of the Augusta market, or to relieve any city from any disadvantage in markets of other cities, or to deprive all cities or places of production of any advantage resulting from their location. Such an interpretation would make the fourth section of the act practically inoperative, and with such license in rate making carriers might give advantage to, build, or destroy the carriage or other business of any other city or locality."

It is certainly true that competition of this character is more uncertain in its effect, and more difficult to ascertain in character and extent, than competition of carrier with carrier.   In the case of competition of market with market many questions of commercial facilities and advantages of competing points would have to be considered, and it is not perhaps as direct in its effect as competition of carrier with carrier.   Still, illustrations have been given, by witnesses in this case, of competition of market with market, which would seem to be absolutely controlling with the railroads in rate making.   In this case it is contended that competition with the Baltimore market for the sale of buggies is an element to be considered in making the rate from Cincinnati to Augusta.   It is contended that if the rates were higher the Cincinnati manufacturer would be deprived entirely of the trade with Augusta; and it is urged that this is true of other eastern cities, having communication by the ocean lines with southern seaboards, and thence by rail to Augusta.   Competition of this character may not be so direct in its effect as competition of carrier with carrier; but it seems to be, when it does exist, influential, and perhaps as effective and controlling with the carriers, as to their rates, as other competition, and may constitute a part of the circumstances and conditions which a carrier can consider in fixing rates for transportation of goods.

5. As to the question of undue preference, under section 3 of

the act to regulate commerce, it may be stated that, unless the traffic involved here is obnoxious to the fourth clause of the act, it can hardly be said to be an undue preference in favor of Augusta, or an undue prejudice or disadvantage against Social Circle. In the Party Rate Case (Interstate Commerce Commission v. Baltimore & O. R. Co., 145 U. S. 263, 12 Sup. Ct. Rep. 844) the supreme court say:

"But, so far as relates to the question of 'undue preference,' it may be presumed that congress, in adopting the language of the English act, had in mind the constructions given to these words by the English courts, and intended to incorporate them into the statute. * * * In short, the substance of all these decisions is that railway companies are only bound to give the same terms, to all persons alike, under the same conditions and circumstances, and that any fact which produces an inequality of condition, and a change of circumstances, justifies an inequality of charge."

So that, unless the rates complained of, as compared with each other, violate the fourth section of the act, there seems to be very little ground for claiming that they violate the "undue preference" provision of the third section.

6. It appears from the evidence in this case that nearly all the railroads south of the Ohio river and east of the Mississippi, including the three railroads defendants here, are members of an association known as the Southern Railway & Steamship Association. The purpose of this association is claimed by counsel for the railroads to be to prevent ruinous and disastrous competition, and to keep the rates at a point where the railroads can be successfully operated. On the other hand, it is contended that the claim of the advocates of the association that the purpose of the railroads entering into it is self-preservation is not correct, but that it is rather a combination to keep up rates. Whatever may be the fact about this, (and discussion of that question is deemed unnecessary now,) it seems unquestionably true that the association, in making rates, is governed by competition. The same influences seem to control in the association in making rates as would control without it; and, while the influences may not go to the same extent, and there may be produced by it more harmonious relations and understanding, still it seems to be a fact that competition influences, and, to a large extent, controls, the rates agreed upon by the association.

7. The evidence in this case shows several lines of railroads competing for the business between Cincinnati and Augusta in this way: There are two direct lines between Cincinnati and Atlanta, —one over the Louisville & Nashville and Western & Atlantic roads; the other over the Cincinnati, New Orleans & Texas Pacific Railway and the East Tennessee, Virginia & Georgia Railroad. Then there are other lines which could compete, but over which, as a matter of fact, there does not appear to be real competition between Cincinnati and Atlanta, as they are indirect routes, and are probably at a disadvantage as against the two more direct routes just named. All these different lines, however, from Cincinnati to Augusta, converge at Atlanta, and go thence over the Georgia Railroad to Augusta. This is competition of carrier with carrier,

..hich is said to constitute dissimilar circumstances and conditions. There is competition of Baltimore and other eastern cities with Cincinnati for the trade of Augusta; and that it is active and influential is quite clearly shown by the evidence. Indeed, it is much more satisfactorily shown than is the competition of carrier with carrier from the point of shipment to the point of destination.

8. In view of the opinion expressed that the carriage from Cincinnati to Augusta is not over the same line, in contemplation of the statute, as the carriage to Social Circle, a determination of the extent and effectiveness of the competition at Augusta, as constituting dissimilar circumstances and conditions, under the fourth section, is unnecessary. It may be added that the competition from Cincinnati by way of the trunk lines to the seaboard, thence by water to Charleston and Savannah, and thence by rail or water to Augusta, seems hardly sufficient to justify its recognition in this connection. The same may be said of all water routes from eastern markets by the ocean and by the Savannah river to Augusta. The evidence fails to show any such amount of shipments, either way, as could at all affect the justice of the rates in this case.

9. The only remaining matter to be disposed of is that of the reasonableness of the rate charged on first-class goods, in less than car-load lots, from Cincinnati to Atlanta. This is a through rate, and it is interstate commerce subject to the control of the commission. The commission determined that the rate should be $1, and ordered that the roads interested should not charge more than $1. The following language is used on this subject by the commission in its report and opinion:

"The only testimony offered or heard as to the reasonableness of the rate to Atlanta in question was that of the vice president of the Cincinnati, New Orleans & Texas Pacific Company, whose deposition was taken at the instance of said company. The witness testified that he had been in the railroad service about twenty-six years, and had much to do with rates during all that time, and that he considered $1.01 per 100 pounds, in less than car loads, a reasonable rate on first-class freight from Cincinnati, Ohio, to Atlanta, Georgia. This statement or estimate of the rate from Cincinnati to Atlanta, we believe, is fully as high as it may reasonably be, if not higher than it should be; but without more thorough investigation than it is now practicable to make we do not feel justified in determining upon a more moderate rate than $1.00 per 100 pounds of first-class freight in less than car loads. The rate on this freight from Cincinnati to Birmingham, Alabama, is 89 cents, as compared with $1.07 to Atlanta; the distances being substantially the same. There is apparently nothing in the nature and character of the service to justify such difference, or, in fact, to warrant substantial variance in the Atlanta and Birmingham rates from Cincinnati."

It will be perceived that the only finding of fact was the testimony of one witness that the rate of $1.01 was reasonable, and the comparative rate to Birmingham, on which the commission seems to lay stress. It seems that for a short time at least a rate of $1.01 was in force from Cincinnati to Atlanta, and that it was as to this rate that the testimony of one witness before the commission was taken. It appears in evidence here that the rate from Cincinnati

to Atlanta, in 1879, was $1.39, and that afterwards it was $1.10, and subsequently $1.07, except, perhaps, as stated, it was for a short time $1.01. As to the rate to Birmingham, there is evidence before the court, which was evidently not before the commission, namely, that the rate from Cincinnati to Birmingham, which seems previously to have been $1.08, was forced down to 89 cents by the building of the Kansas City, Memphis & Birmingham Railroad, which new road caused the establishment of a rate of 75 cents from Memphis to Birmingham; and by reason of water routes to the northwest such competition was brought about that the present rate of 89 cents from Cincinnati to Birmingham was the result. It seems to be no sufficient reason to determine the rate from Cincinnati to Atlanta unreasonable because of the lower rate to Birmingham, when such lower rate is caused by conditions which do not operate as to Atlanta.

So far as the action of the commission in ordering a reduction of the rate from Cincinnati to Atlanta is based on the fact that the same rate is charged to Augusta, that has perhaps been sufficiently discussed in what has hereinbefore been said with reference to the long and short haul clause. The rate to Augusta is caused by conditions which have been stated. No data are given the court from which it can judge whether the rate from Cincinnati to Atlanta on first-class freight, taken in connection with the rates which can be charged and are charged on other and lower classes of freight, gives more than a fair return to the railroads composing the lines, and the court is left to the findings of the commission, and to the testimony of a number of railroad experts, who testified that the rate of $1.07 is reasonable.

There is some difficulty in determining what the duty of the court is in a matter of this kind, under the interstate commerce act. If the conclusion of the commission that the rate is unreasonable is prima facie correct, under the language used, that "the findings of fact in the report of said commission shall be prima facie evidence of the matters therein stated," then the report of the commission would have greater weight with the court than if only facts found, strictly speaking, are to be deemed prima facie correct. But, in either event, if this is, as has been held, a de novo investigation, and inquiry is to be instituted here under new pleadings and new evidence, the court must be satisfied, on the whole case before it, that the rate of $1.07 is unreasonable.

In the case of Interstate Commerce Commission v. Lehigh Val. R. Co., 49 Fed. Rep. 177, the court used this language:

"But then, again, upon an analysis of the above-quoted provisions of section 16, it is demonstrable that in such a case as this it is the duty of the court to investigate the merits of the whole controversy, and form an independent judgment. The court, upon a petition alleging the violation of a 'lawful' order, is to proceed to 'hear and determine the matter, as a court of equity. In such manner as to do justice in the premises,' and to this end it may prosecute in such mode and by such persons as it may appoint all 'needful inquiries,' to enable it to 'form a just judgment,' in the matter of the petition; and, finally, 'on such hearing the findings of fact in the report of said commission shall be prima facie evidence of the matters therein stated.' Nothing

can be clearer than that the findings by the commission are not here decisive of the questions of fact. We have only to add that our conclusion is in harmony with that of the circuit court in the case of Kentucky & I. Bridge Co. v. Louisville & N. R. Co., 37 Fed. Rep. 567."

The court is to "investigate the merits of the whole controversy, and form an independent judgment," according to this last decision; and according to Judge Jackson in the Case of Kentucky & I. Bridge Co., 37 Fed. Rep. 614, the "court is not confined to a mere re-examination of the case as heard and reported by the commission, but hears and determines the case de novo, upon proper pleadings and proof; the latter including not only the prima facie facts reported by the commission, but all such other and further testimony as either party may introduce, bearing upon the matters in controversy."

The conclusion of the commission should undoubtedly be considered in connection with the facts on which that conclusion was based; and the principal fact which seems to have been in the mind of the commission is satisfactorily explained here, as has been indicated. The evidence offered here on behalf of the railroads is, in the opinion of the court, sufficient to overcome any prima facie case that may have been made by the findings of the commission. On the whole testimony, as now before the court, it is not believed that the commission would have found the rate in question to be unreasonable. Certainly the court cannot so determine.

It has been earnestly insisted that the action of the commission as to the rate from Cincinnati to Atlanta is, in effect, making or fixing a rate, and that the order of the commission is, for that reason, beyond the authority granted it by the act of congress. In view of what has just been said, and the opinion of the court, before expressed, as to this rate, it is deemed unnecessary to go into a discussion of this subject. The conclusion is that the court would not be justified in granting the order prayed for by the commission, requiring the defendant corporations to desist from charging a greater rate than $1 per 100 pounds on first-class freight in less than car-load lots from Cincinnati to Atlanta. The court being of the opinion, therefore, that the complainants are not entitled to a decree enforcing either the order as to the Social Circle rate or the rate from Cincinnati to Atlanta, and that being the only relief prayed for, a decree must be entered dismissing the bill.